1                      UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF WASHINGTON
2

3     UNITED STATES OF AMERICA,                 )
                                                )
4                                  Plaintiff, )  No. CR 07-410RAJ
                                                )
5                    v.                         )  Seattle, Washington
                                                )
6     BEVERLEE KAMERLING, et al.,               )
                                                )
7                                 Defendants. )
                                                )
8

9        BEFORE THE HONORABLE RICHARD A. JONES, DISTRICT JUDGE

10              REPORTER'S TRANSCRIPT OF PROCEEDINGS

11                        APRIL 11, 2008

12

13     (see next page for appearances)

14

15

16

17

18

19

20

21

22
       Court Reporter:              Laurene Kelly, RDR, CRR
23                                  P.O. Box 20502
                                    Seattle, WA  98102
24                                  206.499.6003

25     Proceedings recorded by mechanical stenography, transcript
       produced by computer-aided transcription.

```
 1                          APPEARANCES

 2

 3    For the Plaintiff:              JIM LORD
                                      Assistant U.S. Attorney
 4

 5
      For Defendant Kamerling:        LYLE TENPENNY
 6                                    ANGELO CALFO

 7    For Defendant Nick Alexander:   JIM HENDERSON

 8    For Defendant John Worthen:     HOWARD RATNER

 9    For Defendant Seth Quinto:      WILLIAM HINES
                                      NICHOLAS PINTO
10
      For Defendant Joel Ramsden:     JOHN POLLOK
11                                    JEFF HOFFMAN

12    For Defendant Don Goldstein:    HERBERT COHEN

13    For Defendant Jamie Goldstein:  ROBERT GOLDSMITH

14    For Defendant John Johansen:    RALPH HURVITZ

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   SEATTLE, WASHINGTON                    FRIDAY, APRIL 11, 2008
 2   HON. RICHARD A. JONES, DISTRICT JUDGE              9:20 A.M.
 3                        PROCEEDINGS:
 4          THE CLERK:  This is the matter of the United States
 5   of America versus Beverly Kamerling, et al., cause number
 6   CR07-410 assigned to this court.
 7          Counsel please rise and make your appearances for the
 8   record.
 9          MR. LORD:  Good morning, Your Honor.  Jim Lord for
10   the United States.
11          THE COURT:  Good morning.
12          MR. TENPENNY:  Good morning, Your Honor.  Lyle
13   Tenpenny and Angelo Calfo for Miss Kamerling.
14          MR. HENDERSON:  Good morning, Your Honor.  Jim
15   Henderson for Nick Alexander.
16          MR. RATNER:  Good morning, Your Honor.  Howard Ratner
17   for John Worthen.
18          MR. HINES:  Good morning, Your Honor.  Bill Hines --
19          MALE VOICE ON SPEAKERPHONE:  Good morning, Your
20   Honor.  John Pollok and Jeff Hoffman for the defendant Joel
21   Ramsden, who is present with us in our office.
22          THE COURT:  Good morning.
23          MALE VOICE ON SPEAKERPHONE:  Good morning, Your
24   Honor.  Judge, Herbert Cohen in Fort Lauderdale, Florida on
25   behalf of Don Goldstein who is on the line at his home.
```

1              THE COURT:  Thank you.

2              MALE VOICE ON SPEAKERPHONE:  Good morning, Judge.

3    Nicholas Pinto for Seth Quinto.  I'm in New York; Mr. Quinto is

4    on the line in his home.

5              THE COURT:  Good morning to you as well.

6              MALE VOICE ON SPEAKERPHONE:  Good morning, sir.

7              THE COURT:  Now, counsel.

8              MR. HINES:  Bill Hines, local counsel for Seth

9    Quinto.

10             THE COURT:  Thank you.

11             MR. GOLDSMITH:  Robert Goldsmith for Jamie Goldstein,

12   who I presume is on the line.

13             THE COURT:  Good morning.

14             Mr. Goldstein, you're on the line?

15             MALE VOICE ON SPEAKERPHONE:  Yes, sir.

16             THE COURT:  Good morning to you, sir.

17             MR. HURVITZ:  Good morning, Your Honor.  Ralph

18   Hurvitz, local counsel for John Johansen.

19             I understand Mr. Johansen is on the line.

20             THE COURT:  Mr. Johansen, you on the line as well?

21             MALE VOICE ON SPEAKERPHONE:  Yes, Your Honor.

22             THE COURT:  Thank you.  Is there anyone else that

23   needs to be introduced at this time?  There appears not to be

24   so.

25             We are here for a status conference this morning.  I

1    have received two motions.  The Court will get to both of those

2    motions, but I'm going to take those matters up at the end

3    because they may not relate to some of the other counsel.  And

4    parties may choose to leave or not participate; that will be

5    their call.  But I want to take those up at the end.

6              First is my understanding is that there has been a

7    Rule 20 consent to transfer on the matter of John Johansen, and

8    let's address that first.  Has that taken place?

9              MR. HURVITZ:  The transfer is -- oh, I'm sorry.

10    Ralph Hurvitz on the record, Your Honor.

11              I spoke last night with Mr. Futerfas, who's the

12    attorney for Mr. Johansen.  My understanding is that plea has

13    not yet been entered, and I don't believe a date has been

14    scheduled yet for the entry of the plea.

15              THE COURT:  Mr. Lord, do you have any different

16    information?

17              MR. LORD:  No.  I was just going to indicate it's my

18    understanding that the file has in fact been transferred to the

19    Eastern District of New York but, as Mr. Hurvitz indicated, the

20    plea has not yet been entered.

21              THE COURT:  At this point, then, until that's

22    actually taken place, we will operate under the assumption that

23    Mr. Johansen's still within this court's jurisdiction and will

24    be required to participate in the conferences.

25              Now, at this point before we get to the other

1    motions, it's open now for any matters that need to be brought

2    to the Court's attention.  That's the reason we're having these

3    status conferences.  I have not been advised of any specific

4    issues that need to be addressed, but the thing is I want to

5    make sure there aren't any outstanding discovery issues.  If

6    there are, I want to know about them now.

7            I like to know if there's any issue regarding the

8    opportunity to access witnesses, if there's any issue as far as

9    disclosures of any expert witnesses in this case, and any

10   general issues that this court can provide any degree of

11   assistance in any regard.

12           Counsel for the government, why don't we start with

13   you?

14           MR. LORD:  I'll just report to the Court that we

15   complied with our discovery obligations as set forth in the

16   Court's scheduling order and all of that discovery has been

17   produced, and we've provided all defense with a copy of -- with

18   a letter setting forth who our potential expert witnesses are

19   in the case as required by the order.

20           THE COURT:  Have you been advised of any specific

21   issues or concerns regarding the ability to review any material

22   because of the possible degradation of files because of the

23   number of times they've been copied or access to the documents

24   that you have available or the volume of information that you

25   have available?

1                MR. LORD:  No, Your Honor.

2                THE COURT:  Are you aware of any issues that need to

3     be addressed as far as the government is concerned?

4                MR. LORD:  No, Your Honor.

5                THE COURT:  Counsel, any issues that you want to

6     bring to the Court's attention at any level in any regard?

7                MALE VOICE ON SPEAKERPHONE:  Judge, John Pollok in

8     New York.

9                We received from the government timely, of course, a

10    hard drive of -- with respect to certain discovery material.

11    We are unable at this point to download it, so we need some

12    technical information from the government as to the nature of

13    the software that is needed to download.

14                THE COURT:  Have you been in contact with the

15    government to even inquire?

16                MALE VOICE ON SPEAKERPHONE:  Yes, Your Honor.

17                THE COURT:  Have they resisted --

18                MALE VOICE ON SPEAKERPHONE:  Not yet, because

19    apparently the individual who's responsible for it is not in

20    the office today, so they couldn't -- we got it yesterday and

21    we inquired this morning.

22                THE COURT:  Does that present a problem, Mr. Lord?

23                MR. LORD:  No, Your Honor.

24                Just so the Court's aware, the reason they got it

25    yesterday is they didn't provide us with the hard drive until

1    after March 31st; so as soon as we got it we did the

2    downloading, got it back to them promptly as soon as that was

3    completed.

4            And there was a phone call placed to my office that

5    my legal assistant picked up about ten minutes before court

6    from Mr. Pollok's office suggesting there may be a problem with

7    accessing the software -- I mean the data that we had produced.

8    That's the first I've heard of it.  I asked my legal assistant

9    to call their office back and to report to them that after this

10    hearing we would put them in contact with the technical person

11    at the FBI who actually did the downloading so that they can

12    figure out how to access it.

13            THE COURT:  Mr. Pollok, it appears that that will

14    address your specific concern.  Do you agree, counsel?

15            MALE VOICE ON SPEAKERPHONE:  Yes, absolutely.  The

16    reason is we got it yesterday because the hard drive that we

17    originally sent was too small so we sent a new one.  There's no

18    problem.  We just need to figure out how to do it.

19            THE COURT:  All right.

20            MALE VOICE ON SPEAKERPHONE:  And we will talk to the

21    appropriate FBI agent on Monday, I guess.

22            THE COURT:  Other counsel have specific issues to

23    bring to the Court's attention other than the motions which

24    were noted?

25            MR. TENPENNY:  Just briefly, Your Honor.  We did

1    receive the government's electronic production --

2              MALE VOICE ON SPEAKERPHONE:  Who's this talking,

3    please?

4              MR. TENPENNY:  I'm sorry.  This is Lyle Tenpenny for

5    Miss Kamerling.

6              We did receive the government's production.  We're

7    still, you know, in the process of downloading it into our --

8    you know, into our, you know, document software and reviewing

9    it.  It's quite voluminous.  There are 1200 gigabytes of

10   material we're going to review, so I just would note that we

11   are in the process of reviewing it.  The government did submit

12   it by March 31st, and we reserve the right to raise any issues

13   with respect to that production at a later time.

14             THE COURT:  All right.  Anyone else has any specific

15   issues, then let's now deal with the actual motions which were

16   presented to this court.  The Court has received defendant

17   Kamerling's motion to strike certain conditions of release and

18   defendant Nicholas Alexander's second motion to modify

19   conditions.  This is a defense motion, so let's start first

20   with Miss Kamerling's motion to strike certain conditions of

21   release.

22             Counsel, you wish to address the Court at this time?

23             Now, before we address these matters, these status

24   conferences are giving the parties the opportunity to address

25   or raise any specific questions that you have.  If you

1  collectively know that there's no need for the status

2  conference, please let the court clerk know.  I don't want to

3  bring you here unnecessarily.  Second -- but I do want to give

4  you the opportunity to come here and deal with any specific

5  problems, and that's the purpose of these.  So if we don't need

6  these, let me know.  I'm certainly not going to waste anybody's

7  time.

8           If you don't want to participate in the remaining two

9  matters before this court, you're certainly free to leave as

10  well.  If you want to stay here out of curiosity, that's your

11  call.

12           MR. CALFO:  If I may, Your Honor.

13           THE COURT:  You may.

14           MALE VOICE ON SPEAKERPHONE:  Judge, this is John

15  Pollok again in New York, and, while this has not been raised

16  before, it does raise the hackles on the back of my neck.

17           The discovery that we got is vast, as Mr. Tenpenny

18  has indicated.  Ours is not quite as large as theirs, but it's

19  in excess of 750 gigabytes.  I know Mr. Lord has represented to

20  the Court that the trial will be of a certain duration.

21  However, based on the discovery I begin to wonder whether or

22  not he wishes to reassess that and advise the Court that the

23  trial may be of significantly longer duration than he

24  originally estimated.  We think it will.

25           THE COURT:  Okay.  Well, at this point in time,

1    counsel, we met or addressed that question the last time

2    everyone was here, and the Court believes, other than the fact

3    that discovery has been provided, there's no specific basis

4    presented other than sheer volume to support your or anyone

5    else's claim for further delay or the extent of time for the

6    trial.  So at this point in time we'll leave the trial

7    suggestion as indicated --

8            MALE VOICE ON SPEAKERPHONE:  Judge, I just wanted to

9    make the Court aware that -- as to the quantity of discovery.

10   I wasn't making any motion at this point.

11           THE COURT:  Okay.  I appreciate that, counsel.  And

12   I've gotten two different quotes in terms of the volume.  One

13   lawyer says it's seven gigabytes and someone else --

14           MALE VOICE ON SPEAKERPHONE:  750.  750 gigabytes.

15           THE COURT:  Okay.  Well, somewhere in between those

16   two.  Thank you, counsel.

17           MR. CALFO:  Your Honor, just on the issue of status

18   conferences and before other people may leave, I, for one,

19   think the status conferences are a good idea to have.  Now,

20   perhaps today we didn't have any specific issues to bring to

21   the Court.  That wasn't necessarily clear --

22           MALE VOICE ON SPEAKERPHONE:  If someone's talking, I

23   can't hear.

24           THE COURT:  Counsel, why don't you step up to the

25   lectern.

1              MALE VOICE ON SPEAKERPHONE:  Thank you, Judge.

2              THE COURT:  And for the future, since we do have

3    participants by the phone, let's always step to the lectern and

4    always identify yourself before you speak.

5              MR. CALFO:  Yes, Your Honor.  It's Angelo Calfo on

6    behalf of Miss Kamerling.

7              Just with respect to the status conferences, as I

8    said I think these conferences are a good idea.  I'd like to

9    see the Court schedule another one, if it would, for six weeks

10   out or so.  Before everyone leaves I thought it might be a good

11   idea to discuss dates.  That's my suggestion.

12             I know today we didn't have anything, but because of

13   the, you know, voluminous nature of this discovery and the

14   likelihood that there will be some issues with respect to

15   discovery, including expert discovery, I think having another

16   date set would be a good idea.

17             THE COURT:  Are there any other persons that would

18   disagree with counsel?

19             MALE VOICE ON SPEAKERPHONE:  No.

20             THE COURT:  Let's set a date out now.  Counsel, the

21   next date that I could possibly accommodate would be -- are

22   Fridays preferable?

23             MALE VOICE ON SPEAKERPHONE:  Doesn't matter.

24             MR. CALFO:  Fine.

25             THE COURT:  Does it make a difference for the

1    parties?

2             MR. RATNER:  No.

3             MALE VOICE ON SPEAKERPHONE:  No, sir.

4             MALE VOICE ON SPEAKERPHONE:  No.

5             THE COURT:  Counsel, how about June 13th at 1:30?

6             MALE VOICE ON SPEAKERPHONE:  June 13th.  Is that your

7    time, Your Honor, or --

8             THE COURT:  1:30 Pacific Standard Time.

9             MALE VOICE ON SPEAKERPHONE:  Pacific Standard Time,

10   1:30?

11            THE COURT:  Yes.

12            MALE VOICE ON SPEAKERPHONE:  That will be 4:30 in

13   Florida and New York.  June 13th, Friday.

14            THE COURT:  I see no disagreement from any of the

15   parties, so the Court will set it at 1:30, June 13th, Pacific

16   Standard Time.  And again, counsel, if you do not have any

17   specific issues, then we may cancel that hearing.  But I want

18   to schedule it so everyone knows exactly what's taking place.

19            In that regard, any party who wishes to leave, you're

20   free do so.  But those parties that do have specific motions

21   before this court, this is your opportunity to address the

22   Court.

23            So, Mr. Tenpenny, if you'd retake the stand.

24            MR. TENPENNY:  Again, good morning, Your Honor.  Lyle

25   Tenpenny for Miss Kamerling.

1          We had filed a motion that is directed at two of the

2     conditions of Miss Kamerling's appearance bond.  The first

3     relates to the condition that is a virtually complete ban on

4     her Internet use, and we -- and the second relates to the

5     financial reporting requirement.  And I'll address the Internet

6     condition first.  I think that issue is more straightforward.

7          Your Honor, simply put, there's no legal or factual

8     basis for that condition.  The government has not been able to

9     cite a single instance in this district when a similar Internet

10     restriction has been imposed in a case with similar facts.  It

11     cited two instances in nonsexual cases in which a similar

12     Internet restriction was imposed, and those related -- those

13     were in cases where there was sophisticated computer hackers

14     who were able to infiltrate secure computer systems and wreak

15     havoc.  If anything, those two examples show why the imposition

16     of that condition in this case is simply inappropriate.

17          The government hasn't cited any other district court

18     decisions that would support a condition, similar condition, or

19     a condition in a similar case.  And we've cited a number of

20     circuit court decisions in the Ninth Circuit and in other

21     circuits around the country showing that circuit courts are

22     quite skeptical of broad Internet restrictions, and that

23     reflects, I think, in part that we live in the twenty-first

24     century and the Internet is such a central part of our daily

25     lives in a number of the nine ways.

1          We've cited two Ninth Circuit decisions in the last

2    year in which Ninth Circuit said categorically, we are aware of

3    no instances in which this court has approved a similar

4    Internet restriction as the one imposed in this case in

5    nonsexual cases.  And there are other circuit courts from

6    around the country that have made similar statements and have

7    taken similar positions.

8          I'm aware that the -- those cases arose in the

9    supervised release context, but that doesn't mean they have no

10   application here.  The standards for the supervised release

11   conditions are strikingly similar to the conditions, pre-trial

12   release conditions.  Those conditions are to be narrowly drawn,

13   and they're to reflect the need for community safety.  They're

14   supposed to be reasonably related to the offense.

15         And that bears a striking resemblance to 3142

16   standard, and so it simply isn't the case that those Ninth

17   Circuit decisions hold little value, as the government argues.

18   So legally simply there is no precedent for this Internet

19   restriction.

20         Factually there is no basis for it either.  The

21   government spends most of its brief giving a laundry list of

22   what it thinks are its greatest hits of evidence, whether or

23   not they relate to the Internet, and at around page 9 of its

24   brief it finally comes around to saying, well, she used email.

25   And, if email use were all that were needed to justify a broad

1    Internet restriction, then it would become a standard condition

2    in any white collar case.  It's hard to any imagine any white

3    collar case not having some relationship, however attenuated to

4    the Internet.  People use email.  People are on the Internet

5    for a number of reasons, and the government grasps for a

6    connection between this case and the Internet.

7           It bears noting that when it was arguing for

8    detention before Judge Donahue Miss Kamerling's Internet use

9    was never mentioned.  It wasn't a part of its motion for

10   detention, and clearly this has been an attempt when this

11   issue's been raised to try to draw a connection between

12   Miss Kamerling and the Internet, when that relationship is

13   attenuated.

14          Miss Kamerling -- the evidence in the case would

15   suggest that phones and fax machines and U.S. mail and even

16   wires are far more at issue in the case, and the government

17   hasn't suggested she should be banned from using those devices,

18   and I think that it would be pretty clear that, if the

19   government tried to ban her from using telephones, then that

20   would be considered overreaching.

21          And I think that that analogy holds true here.

22   There's no connection -- there simply isn't a basis to say

23   that, well, she used email, certainly not, as I say, a legal

24   basis, and there's not a factual basis for saying that mere use

25   of email can support the Internet restriction.  Frankly the

1    Internet and the emails that the government mentions on page 9

2    of its brief are ambiguous at best.  They don't even

3    necessarily show that those emails were inappropriate.

4              So again, Your Honor, we think this issue is

5    straightforward.  There's no precedent to support the

6    restriction, and this is a garden variety white collar case.

7    It can't be the case, it can't be the case that in any case

8    where there's a -- some connection to the Internet that you get

9    this kind of restriction.  And that's exactly what the

10   Barsumyan court in the Ninth Circuit case -- said somewhat

11   sarcastically a mere nexus between the computers and the crime

12   doesn't mean that the defendant should be barred from anything

13   with a circuit board.  And that's kind of what -- that's a

14   quote that I think applies to this case.

15             The second issue, Your Honor, relates to the

16   financial reporting requirement on her bond.  We received

17   financial forms from Pre-trial Services earlier this year.  We

18   looked at those forms and had a number of conversations with

19   Miss Kamerling about them, and we tried to think carefully

20   about what information could be provided on those forms without

21   raising Fifth Amendment concerns, and we submitted -- and, you

22   know, we asked for some more time to consider that issue,

23   Pre-trial Services graciously gave us that time, and in

24   February we submitted a partially completed financial

25   statement.

1          Some of the information that's requested on that form
2     does raise real Fifth Amendment concerns for Miss Kamerling.
3     But before I address those Fifth Amendment concerns I just
4     think there's an easier way to address this issue.  Because
5     there are some thorny Constitutional questions with compelling
6     Miss Kamerling to provide that information.
7          And the more simple way of addressing the issue is
8     to -- simply asking is that information necessary, is it the
9     least restrictive way for Pre-trial Services to effectively
10     supervise Miss Kamerling, you know, before trial.  And we don't
11     think that the information that's requested and that has yet to
12     be provided will do anything to further Pre-trial Services'
13     supervision of Miss Kamerling.
14          The information asks such questions as her tax -- you
15     know, asks for tax information and asks for securities she
16     owns, it asks for her business holdings, business associates,
17     and it's just hard to see how providing that information will
18     do anything to assure her appearance, to insure community
19     safety.
20          The information she's provided, she's provided her
21     bank account, and she's given her consent to -- for Pre-trial
22     Services to access her credit records.  So Pre-trial Services
23     can at a minimum monitor whether there's new income coming in,
24     whether she's accessing -- whether she's accessing new lines of
25     credit, and that should be the issue.  It's hard -- it's just

1    hard to see how her providing this other information is going

2    to put Pre-trial Services in a position to better supervise

3    her, and it certainly -- Pre-trial Services is not -- in a case

4    with such complex allegations it's hard to see how they are in

5    a position to take the information that's requested and make

6    the determination of whether she is committing a bond

7    violation.

8              THE COURT:  Ask you this, counsel.  Would you not

9    agree with the Court that one of the primary purposes of

10   pre-trial supervision and one of the necessary components of

11   supervision is to have some degree of appreciation or

12   understanding of how an individual supports themselves?  Would

13   you agree with that basic proposition?

14             MR. TENPENNY:  Yes, I would, Your Honor.

15             THE COURT:  And with that, counsel, it's my

16   understanding at that this point in time Pre-trial Services has

17   no actual or effective way to have an understanding even of how

18   your client supports herself.  It's my understanding that they

19   don't have or have not seen the bank statement information,

20   that Pre-trial Service does not have any credit history

21   information.  They have not had any level of detail.  And I

22   believe they have even attempted to try and run a credit check

23   and there's absolutely no credit history that comes up about

24   your client.

25             So that puts Pre-trial Services in a guessing game as

1    to how your client supports herself.  Could you address that

2    question of how or what information you think is appropriate to

3    be disclosed.

4              MR. TENPENNY:  Well, the government already has --

5              THE COURT:  When you say government, we're talking

6    about two different entities.  You're talking about the United

7    States Attorney's Office and we are talking about Pre-trial

8    Services.  Two different components.  Talk about what you

9    specifically provided to Pre-trial Services.

10             MR. TENPENNY:  The information that's been provided,

11   you know, I can't speak to what Miss Kamerling's credit

12   history, you know, would reveal.  That information's been run

13   through.  I don't know the answer to that.

14             Miss Kamerling is directed not to be self-employed,

15   and she's directed not to commit any crimes on pre-trial

16   release, and Miss Kamerling is honoring those conditions of her

17   bond, and if the government -- and I say the government.  I am

18   referring to the prosecution -- if the prosecution thinks that

19   there is reason to believe that she's not honoring those

20   conditions, then they can take the appropriate steps.

21             But the issue here is should Miss Kamerling be

22   required, be compelled to provide information that could be

23   used in the -- in a case against her in some form, whether for

24   sentencing or whether to develop investigative leads.  And so I

25   do think we do get into the Fifth Amendment issue when

1    Pre-trial Services is saying, we want to know, we want to know
2    everything about how she's -- you know, how she lives her life.
3              Because that is what this case, you know, is very
4    much about.  The government is charging that she uses --
5    alleged she uses nominees, that she has been hiding money and
6    she's not paid --
7              THE COURT:  Okay.  One of the parties on the
8    telephone has a child in the background.  It's difficult for
9    the Court to hear what's taking place.  So if you could address
10   that concern.  Thank you.
11             Please continue.
12             MR. TENPENNY:  I'm sorry, Your Honor.  The
13   allegations in the case, there's a near complete overlap
14   between those allegations and the information that's requested,
15   and so the fact is that providing this information does place
16   Ms Kamerling at risk.  I don't think there's any question about
17   that when you consider that in -- Pre-trial Services is
18   permitted to give the government the information that she
19   provides under certain circumstances, and again it shouldn't
20   be -- her providing this information shouldn't be used as an
21   investigatory shortcut.  If the government believes that
22   there's continuing -- if there's a violation of her bond, it
23   can pursue the appropriate steps.  It can reconvene a grand
24   jury; it can try and subpoena other business records and the
25   like.

1              But compelling her to provide this information to

2     Pre-trial Services does raise valid Fifth Amendment concerns,

3     and I do think that there's a question as to whether it's

4     really needed for purposes of insuring her appearance and the

5     community's safety.

6              So I do think there's a tension there and I do think

7     that -- I understand the Court's concerns about whether the

8     information -- and Pre-trial Services' concerns about whether

9     the information that's been provided gives a complete financial

10    picture.  Miss Kamerling has endeavored to give the information

11    that she believes she can give at this point without raising

12    the Fifth Amendment issue.

13             THE COURT:  What do you believe your client's

14    produced to Pre-trial Services right now, counsel?

15             MR. TENPENNY:  What do --

16             THE COURT:  What do you believe or what records do

17    you have of information that's actually been produced to

18    Pre-trial Services?

19             MR. TENPENNY:  Well, we've identified the bank

20    account that she holds at I believe it's Bank of America, if I

21    recall, and the account number.  We've given her -- again her

22    credit information for them to run that check.  We've given

23    information about her assets, you know, certain personal

24    assets.  I believe we've given her loan information.

25             THE COURT:  When you say about personal assets, I

1   want to clarify exactly what you believe that you provided,

2   because my understanding of what actually has been produced is

3   much more restrictive than what you've represented, counsel,

4   because I understand that she's given information about her --

5              MR. TENPENNY:  Personal property may be a better -- I

6   don't know if that's -- that helps, but I recall she was -- she

7   did provide information about some small personal items, you

8   know, personal assets, jewelry and the like, that she owns,

9   which was information that was requested on the form, I believe

10  some information about real estate, which the answer was that

11  there was none.  I can't recall others.

12             I mean there certainly were a number of the -- much

13  of the information that was requested was implicated in the

14  Fifth Amendment issue, but we did provide -- we did provide

15  bank information and we did provide the, you know, again the

16  background for the credit check as well, which again I would

17  argue is primarily the information that Pre-trial needs.

18             THE COURT:  And, counsel, you expressed concern about

19  the government, meaning the U.S. Attorney's Office, having

20  access to the information provided to Pre-trial Services.  What

21  if the Court were to include a condition that would restrict

22  Pre-trial Services of making any disclosures to the United

23  States Attorney's Office or any other entity without prior

24  approval of this court?  That way you'd have a complete

25  understanding and have the opportunity to come into court and

1    raise any objection to any specific information that might be

2    disclosed by Pre-trial Services to the United States Attorney's

3    Office, again predicated upon the issue that you've raised

4    before this court.

5             MR. TENPENNY:  I think there's two responses.  One is

6    I think Pre-trial Services -- my understanding is Pre-trial

7    Services is required to put this information into any sentence

8    report that goes to the Court, if there were to be a conviction

9    in the case, so that's -- that would not relieve that concern,

10   because that information can find its way to the Court for

11   purposes of sentencing, and the Ninth Circuit has said that

12   providing information that could be used to enhance a sentence

13   is also implicated in the Fifth Amendment.

14            THE COURT:  We're not there yet, counsel.

15            MR. TENPENNY:  And I'm not saying that I hope -- and

16   I hope that we're not, Your Honor.  I'm simply saying that that

17   is a way that it could still place her at risk.  It doesn't

18   relieve all the concerns, is my point raising that issue.

19            And I'm forgetting the other point I wanted to make

20   on that, Your Honor.

21            THE COURT:  You wish to confer with counsel?

22            MR. CALFO:  Your Honor, I forget plenty of things as

23   well.

24            MR. TENPENNY:  I think the issue is -- the concern is

25   that Pre-trial Services -- we know that Pre-trial Services and

1    the government, you know, are frequently, you know,

2    communicating about the case.  I just note that my client has

3    grave concerns about providing the information, you know, and

4    knowing that under some circumstances it could be -- it could

5    find its way to the prosecution team and could be used to

6    develop investigatory leads and for other reasons.

7              THE COURT:  Okay.  Thank you, counsel.

8              Counsel, if you do think what the other issue is or

9    if you can refresh Mr. Calfo's recollection, then one of you

10   can come back after I've conferred with the government.

11             MR. CALFO:  Your Honor, I don't know if it would be

12   helpful.  I don't want to double-team the Court.

13             THE COURT:  Step up to the lectern, counsel.  Again

14   identify yourself for those persons on the phone.

15             MR. CALFO:  Thank you, Your Honor.  Lyle and I can do

16   the job of one lawyer together.

17             THE COURT:  Okay.

18             MR. CALFO:  My only observation, I guess, is I --

19   once the information is released to the government, I think

20   that's where the Fifth Amendment concern arises.  It's not

21   whether or not it's ultimately used, because once the

22   information has gone to a third party it's out of the control

23   of the defendant; so the Fifth Amendment issue comes into play

24   right when the information's provided, not with respect to

25   whether there are contingencies that could occur that would

1    result in the government getting it.

2          And so the real issue is whether there's a real,

3    appreciable concern about this being used against Ms Kamerling,

4    and I think in this instance there is because she's got to give

5    the information to Pre-trial, and then there are a bunch of

6    reasons that it could go to the government, some of which are

7    contingent, some of which are not.  But they are required to

8    give the information at sentencing.

9          We had this same issue in Mr. Cook's recent case.

10   The information was given to Pre-trial.  Judge Zilly entered an

11   order saying it wouldn't go to the government unless there was

12   a prior court order.  Went into Mr. Cowan's office to have a

13   interview with Mr. Cook, and Mr. Cowan had already received all

14   the information from Pre-trial that we had been promised

15   wouldn't get to the government through the Probation Office

16   report.

17         And I'm not saying they did anything wrong.  Just

18   Pre-trial did exactly what they're required to do under the

19   statute and Mr. Cowan's position was we get it and it doesn't

20   matter what the judge's order says.  It's in the statute.

21   That's just one way.  There's always specific ways under

22   pre-trial statutes that allow Pre-trial to give the information

23   to the government if they think there's a suspected violation

24   of the bond and the information's relevant, and there's a

25   specific application that allows the information to be used for

1    impeachment purposes in certain instances, which also raises

2    the Fifth Amendment issue.

3            So aside from that legal issue, Your Honor, also I

4    think that it would be fair, because there is a real Fifth

5    Amendment issue here and the Fifth Amendment is an issue that

6    is dealt with on a fact-by-fact basis, that if the Court were

7    to require a -- the provision of any information by

8    Ms Kamerling, it ought to look at it in camera first in light

9    of what the government's allegations are, and then specific,

10   you know, make determinations about whether or not the

11   Pre-trial Service officer needs or should have that information

12   in light of the Fifth Amendment.

13           So those are the two observations that I had, Your

14   Honor.

15           THE COURT:  Thank you, counsel.

16           Let's hear from counsel representing Mr. Alexander,

17   because he also has an issue regarding the restriction on his

18   use of the Internet, and then we can have Mr. Lord address all

19   the concerns.

20           MR. HENDERSON:  Thank you, Your Honor.  Jim Henderson

21   for Nick Alexander.

22           THE COURT:  Good morning again.

23           MR. HENDERSON:  Initially, since our motions are so

24   similar, I should probably adopt the things that Mr. Tenpenny

25   has said with regard to the Internet restrictions for his

1     client, because I think they apply equally to mine.  I think

2     this case probably is a pretty good example of how easy it is

3     to track computer use, which is certainly a relevant

4     consideration for Pre-trial Services supervision.

5            In response to the two motions, I notice that the

6     government cited a couple instances in this district relating

7     to sexual predator cases, and I think probably the written

8     papers have made pretty clear my position and other counsel's

9     position vis-a-vis those kind of cases where the computer was

10    used as the sword, as the actual instrumentality of committing

11    a crime, as opposed to the case here where they're merely

12    incidental, as Mr. Tenpenny said, like the telephone or the use

13    of the mails.  They're incidental instrumentalities of

14    committing the crime.

15           And the restriction, according to the Ninth Circuit,

16    in those kind of instances is an overbroad one, which really

17    kicks into sort of the meat of my particular position as a

18    representative for Mr. Alexander.  I'm based in Los Angeles,

19    California, as I think the Court knows, and so my ability to

20    communicate with Mr. Alexander is restricted a little bit.

21    There are literally thousands and thousands and thousands of

22    pages of material to go through here, many of which are

23    telephone conversations intercepted and in which Mr. Alexander

24    is a participant; there are emails; there are all kinds of

25    documents on which his signature is contained; there are all

1    kinds of actions of other co-defendants which he's charged in a

2    conspiracy with that need to be explained.

3         I need to be able to be in contact with Mr. Alexander

4    on a regular basis.  The current restrictions where he can have

5    access to the Internet if he comes to his counsel's office in

6    downtown Seattle and is actively supervised just doesn't work.

7    I've got a small law office with a number of other clients.

8    This isn't my only matter.  I get to this matter when I can.

9         With all the review I'm spending probably three to

10   five hours a day working on this, a lot of the times, at home

11   tonight I may be able to communicate with Mr. Alexander

12   anywhere from two to two dozen times a day, depending on where

13   I am, what I'm doing, and what the particular project is at the

14   time.  It's unrealistic to require him to come downtown in the

15   evening when I might be reviewing something or even at my beck

16   and call during the day.  I'm the one that controls how the

17   progress of the case, not Mr. Alexander.  I need him to be

18   available to me.

19        Also -- and it's struck me when I recently got the

20   government's identification of the expert witnesses that it's

21   going to be using in this case -- I've got a number -- and a

22   number may be an overstatement -- I have several Internet

23   research projects that I want my client to participate in.

24   He's the one most familiar with the facts of this case from my

25   standpoint, most familiar with the facts of the procedures in

1   which he was engaged in.

2            And I want him to be able to do some Internet

3   projects research for me when I ask him to do so.  As I say,

4   I've got a few of those in mind, which I know the Court doesn't

5   expect me to identify at this point because I don't want to

6   disclose where the defense is going, but these are legitimate

7   concerns of mine.  I need Mr. Alexander to be available, and

8   these kind of restrictions are actively and realistically

9   hindering my ability to represent Mr. Alexander in a

10  professional and adequate manner, and I think the situation is

11  going to get worse as I get more into these materials than it

12  gets better.

13           And with that said I know Your Honor has read the

14  papers.  I don't have anything to add to what I have filed

15  previously, and I thank Your Honor for hearing me.

16           THE COURT:  Thank you, counsel.

17           Before I go to Mr. Lord, anything to refresh

18  counsel's memory on the initial point?

19           MR. TENPENNY:  Not at this time, Your Honor.

20           THE COURT:  Thank you, counsel.

21           Mr. Lord, good morning to you again, sir.

22           MR. LORD:  Good morning.

23           Let me begin by briefly discussing what the law is in

24  this area.  The test I think neither of us disagree on is

25  whether the combination of conditions that have been imposed by

1    Judge Donahue constitute the least restrictive conditions

2    necessary to reasonably assure the appearance of the defendants

3    as required and the safety of any other person in the

4    community.

5           Where we disagree is that it's our position that it

6    is relevant to making a determination for the Court to consider

7    the factors that are listed at Title 18 United States Code

8    Section 3142 G, which includes such things as the nature and

9    circumstances of the offense, the strength of the case, and the

10   history and characteristics of the defendant, in addition to

11   whether they use the Internet as a part, as a means to commit

12   the crimes.

13          These factors seem to apply based upon a plain

14   reading of the statute itself, not only to a determination as

15   to whether they're eligible for release under the Bail and

16   Detention Act, but also to what conditions or combinations of

17   conditions should be imposed.

18          If you take a look at 3142 B -- I mean C B -- what it

19   says there is the test that I just quoted to the Court, that

20   must be the least restrictive conditions that will assure the

21   appearance of the person and the safety of the community, but

22   then that begs the question, well, you know, what does that

23   mean.

24          And when you get to G, what G says is that judicial

25   officer shall, in determining whether there are conditions of

1    release -- and then it uses the same language -- that will

2    reasonably assure the appearance of the person as required and

3    the safety of any other person in the community -- take into

4    account the following information, which are the factors that I

5    just reviewed for the Court.

6            Also we have a difference in the significance of the

7    cases that are cited by the defendants in their briefs, all of

8    which involve the supervised release context, which in my mind

9    sets them apart as, at most, being dicta in the context of this

10   particular argument that applies not in the supervised release

11   context but, rather, in a pre-trial release context, and that

12   is because the tests are not, as Mr. Tenpenny suggested,

13   strikingly similar.  I would suggest to the Court that they're

14   different.

15           And that's because in the supervised release context

16   there's a third prong that does not apply in this context,

17   which is the Court must determine whether the condition imposed

18   in the supervised release context involves no greater

19   deprivation of liberty than is reasonably necessary, and that's

20   because, as we pointed out in our brief, when you're talking

21   about supervised release you're talking about punishment,

22   unlike in the pre-trial release context.  That test is not part

23   of the equation that the Court must consider here.

24           Now let me turn to the facts here.  Why are these two

25   conditions that were imposed by Mr. Donahue as part of the

1    overall package of the combination of conditions necessary to

2    remain in order to secure their appearance, and primarily and

3    most importantly, to protect the community?  Protection of the

4    community is well-settled in Ninth Circuit and elsewhere

5    throughout our country, that protection of the community

6    includes protecting them from economic harm or any danger,

7    potential danger of economic harm that could be posed by a

8    defendant who is released reoffending.

9         And I'm not going to, you know, repeat everything

10   that's in my brief but just to kind of summarize topically.

11   Both defendants are facing serious charges and penalties.  The

12   evidence in this case is very strong, including wiretap

13   evidence.  The defendant Kamerling has a history of ignoring

14   court orders and doing so through the use of aliases and

15   nominee bank accounts.  The search of public databases just as

16   of the time we filed the brief shows that both defendants

17   Kamerling and Alexander are still associated with

18   publicly-traded companies.  And, as it relates to the Internet

19   restriction, both defendants in connection with the offenses

20   that have been charged used the computer and the Internet to

21   commit the offenses.

22        And it's not just, you know, the situation, as

23   Mr. Tenpenny argued, of just simply using the email.  It was

24   used as a means to commit the offense here, as we set forth in

25   our brief.  Yes, they used the email to communicate with other

1    coconspirators, but they used it above and beyond that.

2              They used it to send drafts of documents that

3    ultimately were disclosed to the public and contained false

4    representations.

5              They used it to actually post those drafts on Pink

6    Sheets' website, which is where you have to post financial

7    disclosures statements in relation to trading stocks over the

8    Pink Sheets.

9              They used the Internet to engage in conversation in

10   investor chat rooms that were intended to promote the stocks

11   that are at issue here.

12             They used the Internet to circulate drafts of press

13   releases as well as to disseminate press releases as part of a

14   promotional campaign.

15             So the Internet was actually used here as a means or

16   instrumentality of committing the offense, not just simply as a

17   means of communicating.

18             And finally these conditions are necessary in order

19   for Pre-trial Services to be able to effectively enforce the

20   other conditions of release that were set by Judge Donahue,

21   most importantly the one relating to no self-employment.  How

22   are they going to monitor that, as the Court already pointed

23   out, as it relates to the financial disclosure condition, for

24   example, if there's no disclosure allowing them to evaluate

25   what her source of income is?

1          The public database information would suggest they're

2     still associated with public companies, suggests that perhaps

3     income could be coming in from that.  Well, that would violate

4     the no self-employment provision.  So they have got to be able

5     to effectively monitor that, and they can't effectively monitor

6     it without these two conditions being in place as part of the

7     total package.

8          Let me focus now on the Internet condition a little

9     bit more specifically.  The Internet -- it's important that the

10    Court understand this.  The Internet condition imposed by Judge

11    Donahue is not a complete bar on the use of the Internet.  And

12    even the supervised release cases that they discuss, in those

13    cases they were either a complete bar on the use or they were a

14    bar unless they first obtain approval from the Probation Office

15    in the context of supervised release.

16         Here that's one of the options.  They could go to

17    Pre-trial Services under the bond condition as drafted, as

18    ordered by Judge Donahue, and say, can we have permission to do

19    this.  And I think it's important to point out, too, to the

20    Court that these motions were filed when no attempt to even go

21    through what is permitted under the bond condition.  Typically

22    what I would expect would be that they would contact Pre-trial

23    and say can we do it, and if they were permitted to do it it's

24    a nonissue.  If they're not permitted to do it, we might see a

25    motion like this.

1          But this condition doesn't require it necessarily.

2     That's one way they can access the Internet, is with advance

3     approval of Pre-trial; but the other way they can access is go

4     into their local counsel's office and accessing at their office

5     under their supervision, and that condition was absent from the

6     conditions that are at issue in the cases cited by the

7     defendants that relate to the supervised release issues.  So

8     those conditions were more restrictive than the condition that

9     we've got here.

10          After receiving the defendant's reply brief I

11     inquired further within our office as to whether anybody had

12     had a case where a condition had been imposed, where it was not

13     either a child pornography case or a cyber crimes case, and I

14     was able to find one such instance, which I'll cite to the

15     Court.  And it was in the case of Edna Fielder [sic],

16     F-I-E-D-L-E-R, and the case number CR 08-5032 VHS.

17          And in that particular case it was a case that

18     involved conspiracy to commit mail fraud.  The nexus here to

19     the use of the Internet was much less than we have here.  In

20     essence what I can determine from a reading of the complaint

21     seems to be that the Internet was used solely to communicate

22     with coconspirators, not, as we have here, as a means or

23     instrumentality to commit the offense.

24          And in that case Judge Strombom imposed a condition

25     similar to the one that was imposed here but actually an even

1    more restrictive condition, because there they were only

2    permitted to use the Internet with prior approval of Pre-trial

3    Services, whereas here, as I've indicated, they can do it one

4    of two ways, either with prior approval of Pre-trial or by

5    going to their counsel's office.  So there is at least a

6    precedent in our district in at least one other case, and my

7    research was not exhaustive on that point.  There may be others

8    as well.

9         What are the reasons they give for having access to

10    the Internet?  I suggest to the Court they're not particularly

11    compelling.  Ms Kamerling's reasons are to communicate with

12    family.  Well, that can be done in other ways.  Check the

13    weather, read the newspaper, pay bills, and shop.  None of

14    those reasons seem particularly compelling to justify taking

15    away a condition that is important to the total package to

16    insure that Pre-trial can do their job in making sure that the

17    community is protected.

18         Similarly Alexander's purported reasons don't seem to

19    outweigh the need to keep this condition in place to protect

20    society.  The need he proffers to the Court, which are all

21    hypotheticals with the one exception that was argued today by

22    Mr. Henderson with respect to the need to contact his attorney

23    in California -- but the rest of them are hypotheticals because

24    he doesn't say he's at the point of doing any of this.  He says

25    he may need to enroll in college; he may want to take online

1      courses.  If he gets a job, he may have to use the Internet in

2      connection with that job.  He may want to sell items on eBay.

3      None of those seem particularly compelling.  And the last

4      reason is to contact his attorney in California, which I'll

5      address in a minute.

6            But what's important is with respect to everything

7      that Miss Kamerling wants to do, use the Internet for, and

8      everything Mr. Alexander wants to do in terms of accessing the

9      Internet, they can do.  They just got to get advance approval

10     from Pre-trial Services or they got to go to their attorney's

11     office to do it.

12           And in view of the fact that Miss Kamerling's case in

13     particular, she's using her home as her office and using her

14     home computer during the course of the crimes that she's been

15     charged with to commit the crimes and using as instrumentality

16     of the crimes, it's entirely reasonable that Judge Donahue saw

17     fit to restrict that type of Internet use to doing it while at

18     the attorney's office.  The other option is obtaining Pre-trial

19     Services' consent to do it from home.  But, absent that, it was

20     restricted to the attorney's office.

21           Now, with respect to this issue of reaching out for

22     counsel that Mr. Alexander cites, I mean there's a reason I

23     think that our local rules say you have to have local counsel.

24     It wasn't addressed in this specific narrow context, but

25     nonetheless it was -- it's there so that local counsel is

1    available to play a role when necessary in the context of these

2    cases.  So, to the extent he needs to be able to have Internet

3    access with his counsel in California, all he has to do is go

4    to Mr. Phillips' office here and stay there as long as he needs

5    to, to communicate with his attorney down in California.

6            In terms of the Internet research that he has to do,

7    he doesn't have to do that at any particular time of the day.

8    He could arrange with local counsel here, Mr. Phillips, to

9    spend the whole day doing Internet research at his office under

10   his supervision.  That's permitted by the bond that's currently

11   drafted.

12           Now, if the Court nonetheless determines that that

13   condition should remain but be less restrictive, one

14   alternative, which I've proposed in the footnote in terms of

15   the language in our brief, is that the Court permit Internet

16   use only for proper and lawful purposes on a single designated

17   computer located at Miss Kamerling's residence and prohibit her

18   from accessing certain categories of websites and Internet

19   contact as to be determined by Pre-trial Services, which I

20   would presume would include such things as investor chat rooms

21   and Pink Sheets, require installation of filtering and

22   monitoring software, and allow for random searches of her

23   computer by Pre-trial Services.

24           This condition has been approved even in the

25   supervised release context.  And it's important to know, even

1    in the cases cited by the defendants, the remedy there was not

2    to say you can't have any condition at all.  It was to send it

3    back to the district court to make it less restrictive.  Don't

4    make it so broad; make it less restrictive.  And here there are

5    other cases in our district that I've pulled this language from

6    that I stuck in our footnote where that type of condition has

7    been put into place.

8              Now let me turn to the financial reporting condition.

9    It provides that they must provide Pre-trial Services with any

10   requested information regarding your financial status, income

11   sources, and investments, and sign a release of information

12   from the credit bureau if requested by Pre-trial Services --

13             THE COURT:  Counsel, counsel.

14             MR. LORD:  Yes.

15             THE COURT:  Please start over again, go much slower

16   so the court reporter is not having flames come out of her

17   elbows.

18             MR. LORD:  I will do that.

19             MALE VOICE ON SPEAKERPHONE:  Excuse me, Your Honor.

20   Herb Cohen, Fort Lauderdale again.

21             Do we need to let the Court know if we're signing

22   off?

23             THE COURT:  That would be appreciated, counsel.

24             MALE VOICE ON SPEAKERPHONE:  Okay.  This is Herb

25   Cohen.  I'm going to sign off at this point.  This doesn't

1    involve my client Mr. Goldstein.

2            THE COURT:  Thank you, counsel.

3            MALE VOICE ON SPEAKERPHONE:  Thank you for your time.

4            THE COURT:  And your client's free to leave as well.

5            MALE VOICE ON SPEAKERPHONE:  Thank you, Judge.

6            MALE VOICE ON SPEAKERPHONE:  Your Honor, this is

7    Nicholas Pinto for Seth Quinto.  We're going to sign off as

8    well.

9            THE COURT:  That's fine.  Thank you.

10            MALE VOICE ON SPEAKERPHONE:  Thank you, Judge.

11            MR. HURVITZ:  Your Honor, as long as others are

12    departing, if Mr. Jonahson would like to sign off, then he and

13    I can --

14            THE COURT:  You're free to leave.

15            Mr. Johansen, you're free to disconnect as well.

16            MR. HINES:  Likewise Bill Hines.

17            MALE VOICE ON SPEAKERPHONE:  Thank you, Your Honor.

18            THE COURT:  Thank you.

19            MR. GOLDSMITH:  Robert Goldsmith on behalf of Jamie

20    Goldstein.  We'd like to sign off as well.

21            THE COURT:  Thank you.  My apologies, Mr. Lord,

22    for --

23            MR. LORD:  No problem.  Maybe I should get a complex.

24    They all waited to sign off until I was halfway through my

25    argument.

1    THE COURT:  Don't take it personally, Mr. Lord.

2    MR. LORD:  So I will slow down.

3    With respect to the financial reporting condition I

4    was starting to quote, but I'll paraphrase it.  Basically got

5    to provide information regarding financial status, income

6    sources, and investments, as well as sign a release that

7    enables them to do a credit check.

8    And then, very importantly, it says, in light of the

9    allegations in the indictment here, all financial accounts must

10   be in defendant's name.  How are they going to monitor that

11   condition without them first complying with the rest of that

12   provision?  Let me talk about the law briefly, and then I'll

13   talk about the equities that support keeping that condition in

14   place.

15   We have a difference here on what the law says,

16   difference of opinion.  I've cited two cases in our brief.  The

17   Rechnitzer case and Gallion, both of which say that there is no

18   Fifth Amendment privilege that exists with respect to complying

19   with the condition that requires providing financial

20   information to Pre-trial Services, and the rationale behind

21   those decisions is that that's because Title 18 United States

22   Code Section 3153 A 3 says that that type of information is not

23   admissible on the issue of guilt in a criminal proceeding, and

24   therefore it takes away the ability for the defendant to claim

25   that there's any Fifth Amendment privilege with respect to that

1    information.

2           In the reply brief defendants cite a couple of cases

3    just for general principles that a Fifth Amendment privilege

4    exists; but I've read those cases.  Neither of them are on

5    point.  They don't involve a situation -- doesn't even involve

6    supervised release, let alone pre-trial release.  It's in a

7    totally different context.

8           And I've also cited cases in my brief for the

9    principle, for the fact that, if disclosed, it might be able to

10   be used for impeachment purposes down the road also does not

11   give rise to a privilege.

12          So, with that background in place as to what the law

13   is, it's the government's position that it's not a violation of

14   defendant's Fifth Amendment right, even if the defendant were

15   required to disclose everything to the Court, even if the Court

16   after hearing from Pre-trial made a determination it should be

17   released to the government.

18          In addition I think it's important to note that the

19   regulations that were promulgated pursuant to the statute as

20   ordered by Congress require that Pre-trial take assent from the

21   Court prior to disclosing financial information and that the

22   Court before authorizing disclosure give due consideration to

23   any promises of confidentiality and any harm to any individual

24   that might result from disclosure.

25          And I would argue to the Court that that sufficiently

1   protects whatever rights the defendant may have in terms of

2   trying to protect confidentiality, because the Court is going

3   to have to weigh in before that information is released to the

4   government, unless -- and this is one exception -- there's a

5   provision that says if the information bears on a condition

6   that suggests a -- let me -- rather than paraphrasing, let me

7   read that one.  It's actually in the statute here.  It says,

8   violation of conditions of release.  It's in the regulations.

9        Pre-trial Services officer shall in compliance with

10  18 USC Section 3145 5 inform the judicial officer and the

11  United States Attorney's Office of all apparent violations of

12  pre-trial release conditions, unless the person is released

13  under supervision.

14       So they are obligated to inform us directly of

15  violations.  But in terms of disclosure of the details of

16  financial information that's provided, that's only after a

17  court order or after court review and court permission is

18  obtained by the Pre-trial Services officer.

19       I actually agree with Mr. Calfo that it probably is

20  not a workable solution for the Court to add language to the

21  bond that restricts Pre-trial Services from sharing the

22  information with the government, and I think it's problematic

23  because I think that the statute does require, as Mr. Calfo

24  pointed out, that Pre-trial Services share the information

25  under certain circumstances and with certain restrictions in

1  place.  And an attempt by the Court to limit that could run
2  afoul of their obligations under the statute.

3           So my suggestion to the Court is the provision remain
4  as is and that, if the Court wants to exercise more supervision
5  over it, it can certainly do so.  They're obligated to come to
6  the Court anyway to obtain permission before any such
7  information is released.

8           THE COURT:  Thank you, counsel.

9           Miss Smith, good morning.  Please do.  Please step to
10  the lectern.  Please identify yourself.

11           THE COURT:  Good morning again.

12           MISS CONNIE SMITH:  Good morning, Your Honor.  Connie
13  Smith with U.S. Pre-trial Services.

14           Your Honor, if I can just briefly address Mr. Calfo's
15  comments regarding the Wade Cook case, I won't labor that point
16  but I do want to address that there was not inappropriate
17  release of information by Pre-trial Services.

18           I'm intimately familiar with the Wade Cook case.  The
19  information obtained by U.S. Probation regarding the
20  defendant's finances is independently gathered by U.S.
21  Probation.  Pre-trial officer in no way would defy a court's
22  order and release that information to U.S. Probation.  And I
23  can attest to that, Your Honor.

24           Also in my opinion the U.S. Attorney's Office has
25  probably a lot of frustration with this deputy of Pre-trial

1    Services, and I have a very, very conservative position on
2    releasing any information, and I am very strict about the
3    statute and any ex parte communications.

4            The statute states that its released for limited law
5    enforcement purposes.  It's extremely limited, Your Honor, and
6    as the deputy of the agency I always approach the judicial
7    officer in order to protect the statute of maintaining a candid
8    and truthful relationship between the Pre-trial officer and the
9    defendant so that the Court can have the most verified,
10   informed amount of information that they need to proceed as a
11   judicial officer.

12           I do have alternative conditions, if the Court is
13   interested in hearing those in the future.

14           THE COURT:  Okay.  Thank you.

15           Counsel, unless there's something to add or to
16   supplement the answer you previously gave to the Court, the
17   Court's prepared to make its determinations at this time.

18           Mr. Tenpenny.

19           MR. TENPENNY:  Yes.  Briefly, Your Honor.

20           Just to address a couple of the specific points that
21   the government has made, first of all the standard that the --
22   that applies to these bond conditions, the government itself,
23   as noted on page 11 of its opposition brief that the 31 --
24   essentially admitted the 3142 G factors didn't apply when it
25   said that the only factors applicable to the pre-trial release

1    context are those set out in the 3142 C 1 B part of the

2    statute.

3          And, Your Honor, the government says that, you know,

4    basically that the Internet restriction isn't nearly as

5    restrictive as those in the other cases and makes a point of

6    that.  The other -- the other bond condition -- the bond

7    conditions or, I should say -- excuse me -- the supervised

8    release conditions in the Ninth Circuit decisions bear a

9    striking resemblance, and the small dispensations that are

10   given my client that she can access the Internet if she gets

11   prior approval or if I'm standing over her in our office, that

12   simply isn't enough.

13         I mean the fact is I don't have to -- she doesn't

14   have to get advance approval when she uses the phone or when

15   she drops a letter in the mail and when she, you know, sends a

16   fax to my office.  I don't have to be aware of those phone

17   calls or faxes, nor is Pre-trial Services, nor should Pre-trial

18   Services have to approve anytime she wants to send an email to

19   whomever she wants.

20         The other points -- I didn't say in the brief that

21   Miss Kamerling only wanted to be able to read the newspaper and

22   check the weather forecast.  I made the point that there are

23   countless benign reasons we all use the Internet, including

24   those.  Miss Kamerling primarily wants to help us prepare for

25   this trial and, as co-counsel pointed out, there are thousands

1  of electronic images that I can be able to send her, she can

2  review; we can communicate much more efficiently and

3  effectively.  She can research the government's case, research,

4  you know -- conduct a review of the government's discovery, all

5  of which is in electronic format.  There's a number of reasons

6  that she needs Internet access that pertain directly to this

7  case.

8           On the issue of the financial statements, the Fifth

9  Amendment is broad.  The Fifth Amendment applies to any

10  information that places -- compelling information that places a

11  defendant at risk.  As Mr. Calfo pointed out, there is concern

12  about providing this information to Pre-trial Services, a third

13  party, and when that information is released she loses -- she

14  does lose some control over whether that information goes to

15  the government, and -- however -- however conservative

16  Pre-trial Services may be on the release of that information,

17  as to some of the information they have no discretion about

18  whether the information is submitted to the Court, and it

19  can -- and if it believes, not even if it -- if it believes

20  there's a violation, it can ask the Court to release that

21  information, the information she's provided, to the prosecution

22  team.

23           So it's cold comfort in this context that there's --

24  that there may be some controls before the information is

25  released.  Ms Kamerling has to fill out this information that

1    goes directly to the charges and basically hope that it doesn't

2    find its way to the prosecution team, and I don't think the

3    Fifth Amendment asks her to provide the information on a hope

4    and a prayer that it doesn't come back to hurt her.

5              Thank you, Your Honor.

6              THE COURT:  Thank you, counsel.

7              MR. HENDERSON:  Briefly?  One minute, Your Honor?

8              THE COURT:  Clock's ticking, counsel.

9              MR. HENDERSON:  Listening to Mr. Lord's argument I

10   was a little bit troubled by the use of the word

11   instrumentality as the operative word in the case law.  There's

12   always going to be an instrumentality, as made clear from some

13   of the previous arguments, if the mail is used or the telephone

14   is used, and the whole point of those Ninth Circuit cases is

15   that it's far more of a test than a simple instrumentality

16   test.  It's whether or not the use is incidental.  And in this

17   case we have use which is incidental and the computer was not

18   used, as I indicated before, as the sword or the actual

19   instrumentality from which to commit the crime.

20             I also noted that one of the things that Mr. Lord

21   indicated was that Mr. Alexander and Ms Kamerling are still

22   associated with public companies; yet the usual procedure to

23   resign or disassociate from a public company is by an Internet

24   posting, which they're precluded from doing.  It just seemed to

25   strike me as another little indication of why this thing is

1    just so overly broad.

2           And it's certainly not realistic, as Mr. Lord

3    indicated, for Mr. Alexander to have to go to his local

4    counsel's office and sit there all day for anywhere from 8 to

5    16 hours a day waiting for communications from me so that we

6    can operate back and forth.  You know, that doesn't work.  He

7    can't be actively supervised even by local counsel if he was

8    sitting in his office at that point, and it's not, as I say,

9    realistic, and it doesn't make any sense for him to have to sit

10   there and wait for my random communications to him, which are

11   going to come at all hours in the working day and occasionally

12   after working hours.

13          I'm very concerned about, you know, that aspect of

14   the overbreadth of this order because, as I indicated

15   previously, I think this dramatically restricts my ability to

16   adequately represent my client.

17          Thank you, Your Honor.

18          THE COURT:  Thank you, counsel.

19          The Court is going to make the following

20   determination after having given the parties ample opportunity

21   to make their arguments to the Court.  The Court is going to

22   make modifications of the conditions of release, and the

23   Court's going to explain why I'm going to grant those requests.

24          The Court doesn't find that it's really a viable

25   alternative to require the defendants to have to go to

1   counsel's office to have to access Internet information under

2   these circumstances.  One is because of the sheer volume of

3   information that the government has disclosed -- I received

4   reports from two different lawyers ranging from 12 gigabytes of

5   information to 700 -- 50 gigabytes of information -- and the

6   need to communicate and provide information back and forth.  If

7   the Court were to require the defendants to go to local

8   counsel's office to be able to review or inspect that

9   information, that would necessarily tie down local counsel and

10  prevent them from having an active practice in other areas and

11  it would also create an expectation that local counsel would

12  sit there and watch the specific activities of the defendants,

13  and I'm not sure that that's realistic under the circumstances.

14          It is realistic for the defendants to contact

15  Pre-trial Services in advance if they need to go to certain

16  areas, but the Court's going to address that by the following.

17  There's a mechanism that's entitled eBlaster -- for the court

18  reporter it's E-B-L-A-S-T-E-R -- and the eBlaster is a system

19  that can monitor the software of the defendants' computers.

20          Now, it's my understanding that Ms Kamerling and

21  Mr. Alexander live in the same household.  Is that a correct

22  statement, counsel?

23          MR. HENDERSON:  It is.

24          THE COURT:  Assuming that's correct, one, the Court's

25  going to restrict the computer use and Internet use to one

1    line, one computer in the defendants' home.  This eBlaster

2    monitoring device will work as follows:  First of all there are

3    three scans that are run on the specific computer.  The first

4    will reveal the contents of programs on the computer; second it

5    reveals the use of mass storage devices; and the third is the

6    full analysis of the computer.

7          The specific order of the Court will require that the

8    defendant install the eBlaster monitoring software on this

9    computer and that the computer is subject to inspection by

10   Pre-trial Services to insure proper use of the computer.

11         The Court had considered giving the defendants the

12   opportunity to have a unrestricted use of the computer and then

13   allow Pre-trial Services to come in and inspect or check to see

14   what areas had been accessed but, with the capacity to erase

15   memory and erase where an individual has gone on Internet, the

16   Court doesn't believe that that's again giving Pre-trial

17   Services the opportunity to insure compliance with the statute

18   and monitor the activities as intended by this court and as

19   intended by the original order by the magistrate judge.

20         So that use of the computer will permit access to the

21   shopping, the newspaper, the weather, paying bills on line,

22   contacting family and friends, but again it's all subject to

23   monitoring by Pre-trial Services to the device that will be

24   utilized.  It will also put Mr. Alexander in a position to

25   address the specific concerns that he's identified in his

1    request to this court as referenced in the attachment provided

2    to the briefing submitted to this court.

3              The Court believes that that will provide sufficient

4    access to monitoring the Internet and email information.  Now,

5    the Court's also going to put a specific provision that

6    Pre-trial Services is specifically ordered not to monitor any

7    direct communication between counsel and their clients, in

8    order to preserve attorney-client communication.

9              I want to make sure that we're very clear.  Counsel

10   will be directed to provide to Pre-trial Services your specific

11   email account addresses.  The restriction on their ability to

12   monitor are those specific email accounts, so that means you

13   can't give your clients a host of email addresses and say it's

14   okay to communicate here.  It's limited to your exact email for

15   purposes of representing your client sufficiently.  That will

16   address the specific concerns that you've identified this

17   morning in court to be able to communicate with your clients

18   and to provide effective representation of your clients.  It

19   also puts you in a position to be able to provide or send

20   information back to your clients.

21             Now, if you're asking for your clients to do Internet

22   research, the Court has concerns because that opens up the door

23   in terms of what fits within the rubric of Internet research

24   connected to this case.  So I'm not going necessarily that far,

25   counsel, to give your client unlimited access, because that

1    will be monitored as well, if he or she is doing independent

2    research in that regard.  But with the eBlaster device

3    Pre-trial Services can monitor the activities.

4           And, counsel, you need to clearly communicate if

5    those communications are attorney-client protected in the space

6    of the Internet communication.  That way Pre-trial Services is

7    always on alert that they should not review or inspect the

8    nature of those communications.  I believe that adequately

9    addresses the concern for monitoring of the Internet.  It

10   addresses that component of the concerns.

11          Now, any other clarification needed to be provided by

12   the Court for Pre-trial Services or for the parties as it

13   relates to Internet or email use?  Miss Smith.

14          CONNIE SMITH:  Connie Smith again, Your Honor.  If I

15   could also propose, Your Honor, adding to the modified bond

16   conditions that the defendants shall pay all fees associated to

17   eBlaster?

18          THE COURT:  Yes.

19          CONNIE SMITH:  Also -- I'm sorry.

20          THE COURT:  My understanding, counsel, that fee is a

21   one-time fee that's under a hundred dollars and there's no

22   ongoing monthly service cost.  Is that true?

23          CONNIE SMITH:  That's correct.

24          THE COURT:  Okay.

25          CONNIE SMITH:  Also, Your Honor, that the defendants

1    shall be restricted to one identified email account.  And also

2    that the defendants shall provide Pre-trial Services all email

3    addresses and Internet sites in advance, which shall be shared

4    with defense counsel and the U.S. Attorney's Office to

5    determine suitability.

6            Specific to Nicholas Alexander, Your Honor, the

7    defendant's computer use shall be limited to communicate with

8    family, friends, and for educational and employment purposes

9    only.

10            THE COURT:  The Court adopts each of those, counsel,

11    as necessary for purposes of Pre-trial supervision and

12    monitoring.

13            CONNIE SMITH:  Thank you, Your Honor.

14            THE COURT:  And the Court finds that those

15    restrictions are least restrictive and give counsel the

16    opportunity to fully communicate with their clients and

17    addresses each of the concerns and fits still within the

18    confines of 18 USC 3142.

19            Now --

20            MR. RATNER:  Your Honor, could I address one issue on

21    that by Mr. Worthen?  I don't have a formal motion, but I think

22    it might be appropriate to address the Court at this time.

23            THE COURT:  Briefly, counsel.

24            MR. RATNER:  Thank you.  This is Howard Ratner on

25    behalf of Mr. Worthen.

1          I did not make a motion for Internet access.  I have

2    a similar problem as Mr. Alexander does, only perhaps more so

3    dealing with Mr. Worthen.  I'm court-appointed counsel.  He

4    does not have local counsel.  I am the only counsel.

5          I've just sent him a hard drive containing all

6    discovery that we received from the government.  I would like

7    to be able to have his input on that electronically and to

8    email him and to communicate regarding that discovery.  I can't

9    do it.  Just to give an example --

10          THE COURT:  Counsel, are you asking for a me-too

11    motion?

12          MR. RATNER:  Yes.

13          THE COURT:  That puts it in a nutshell, counsel.  And

14    the Court will grant the request for your client, and it should

15    equally apply to all defendants, unless there's other

16    restrictions or concerns from the other defendants.

17          Any other counsel on the line or not on the line that

18    wishes to join in the me-too motion by counsel?

19          MALE VOICE ON SPEAKERPHONE:  Me, too, Your Honor.

20    Jeff Hoffman for Joel Ramsden.  I'm glad we stayed on.

21          THE COURT:  All right.  That will be granted for your

22    client as well, counsel.

23          And, just so we can avoid having to have a separate

24    independent series of motions coming to the Court, any other

25    defendants who were not present on the line for purposes of

1    this Court's determination can make application and the Court

2    will grant the request to modify those conditions, unless

3    there's some other factual circumstances or legal reasons

4    different than what's been presented to this court.

5            Now, as it relates to the financial conditions, I'm

6    not sure that we made much progress this morning.  The Court

7    still does not have any way of identifying from Miss Kamerling

8    how she supports herself.  I gave counsel the opportunity to

9    clarify for the Court how Pre-trial Services can get the

10    benefit of any information of her sources of income and as

11    specifically raised by some of the points made by the

12    government, and the Court's going to require that that

13    condition still remain the same.  The Court's going to require

14    that she provide the information of how she supports herself,

15    what sources of income she has at this point in time.

16            I'm not -- I have no confirmed information that

17    Pre-trial Services has actually seen the bank accounts, so that

18    information needs to be disclosed.  Pre-trial Services has not

19    been able to obtain any information about her credit history.

20    We know that she's provided a name for credit history, but that

21    check to my understanding has produced absolutely no

22    information.

23            The Court does believe that it's necessary to provide

24    this information.  The Court agrees with counsel for the

25    government that this court has a responsibility of addressing

1    any possible economic impact or harm that might result from any

2    other alleged illegal activities by the defendant.  I believe

3    that the nature of the allegations in this particular case

4    certainly warrant the requirement that there is some

5    understanding by Pre-trial Services of the financial

6    wherewithal of the defendant, so in that regard the Court's

7    going to require that information be produced.

8              Now, I am going to add the condition that Pre-trial

9    Services is to advise this court before any disclosures are

10   made to the government of any financial information or

11   violations, so you can certainly put the government on notice

12   of any violations, which you're required to do by statute.  But

13   in terms of the content or substance or specific information or

14   disclosing any information that's been produced to you by the

15   defendants, that information will require the Court's

16   involvement so the Court has an opportunity even, if necessary,

17   to do an in camera review and inspection before that

18   information is produced to the government.  So this court will

19   have direct involvement before any such disclosures are made.

20             Any questions on the Court's rulings or

21   determinations?

22             MR. CALFO:  I do, Your Honor.  Can I speak from here?

23             THE COURT:  Let's step to the lectern, counsel.  I

24   think there might be some lawyers still on line that might be

25   able to hear from you that location.

1          MR. CALFO:  Your Honor, I just want to make sure I

2     understand what the Court's requiring.  From the Court's ruling

3     what I understood is that Ms Kamerling must provide information

4     as to how she supports herself and what the sources of her

5     current income are.

6          THE COURT:  That's correct.

7          MR. CALFO:  Her current bank accounts and to give the

8     Pre-trial officers credit history information.  That's what I

9     wrote down, and I just want to make sure that's what the

10    understanding is as we leave today.  Because those issues I

11    think actually raise far less concern to Ms Kamerling than a

12    seven-page financial statement that has been requested.

13         THE COURT:  Well, I think, counsel, put it this way.

14    I don't know that we've resolved the issue today, but I think

15    if your clients provide at least that source of information it

16    will go a long way to this court making specific modifications

17    in the current condition.  Pre-trial Services has given me a

18    very exhaustive list that is no different than the other list

19    that they provide to other defendants to require them to

20    provide financial information.

21         Once your client provides the information the Court

22    has specifically identified and provides information to

23    Pre-trial Services as to how she supports herself, answering

24    specifically the questions the Court has identified this

25    morning, if that doesn't satisfy Pre-trial Services' ability to

1    monitor your client's sources of income, then you can reapply

2    to this court for reconsideration or further clarification.

3    But right now produce the information, and we can revisit this

4    question at a later point in time.

5              MR. CALFO:  Yes, Your Honor.

6              THE COURT:  Is that satisfactory with Pre-trial

7    Services at this time?

8              CONNIE SMITH:  Yes, Your Honor.

9              THE COURT:  That address any concern that the

10   government has as well?

11             MR. LORD:  Yes.  The only modification in the last

12   statement of the Court that I would suggest is rather than

13   limiting the information that Pre-trial Services request now,

14   because the Court already indicated bond condition remains the

15   same, that they have the ability to request whatever they think

16   they need to do their job, and if for some reason the defense

17   feels a need to involve the Court again in the process it can

18   be raised again with the Court.  But I think it's important

19   that Pre-trial Services be able to request whatever information

20   they need and to make any follow-up inquiries they need to make

21   to fully verify what her source of income is, whether she's

22   self-employed or not and so on and so forth.

23             THE COURT:  I don't disagree with you, Mr. Lord.

24             And I don't want defense counsel to walk out of the

25   door believing that, if you provide just the items listed by

1    the Court, your job is done and that satisfies the Court's

2    concern.  My understanding -- and I want to make sure you have

3    the same understanding -- is that when you provide that

4    information to Pre-trial Services, if they're not of the

5    mindset that that's enough information for them and they need

6    to make further inquiries of you or your clients, you'll need

7    to produce additional information.

8              But if that disclosure presents a further problem

9    then you can certainly come back to this court for

10   clarification and the Court can revisit the question of what

11   you produced, I can look at the quality of information you

12   provided, and then we're dealing with realistic information.

13   Because right now they don't have anything.  I'm not in a

14   position to make any determination as to if it's sufficient or

15   not.  But I can tell you that no information does not satisfy

16   the Court's expectation.

17             MR. CALFO:  Yes, Your Honor.

18             THE COURT:  Okay?  Thank you.

19             MR. HENDERSON:  May I, Your Honor?

20             THE COURT:  Very briefly, counsel.  We're in the

21   middle of a trial and have to get back to that proceeding.

22             MR. HENDERSON:  This will be brief.

23             As you know, I got into the case a little later than

24   other counsel.  I have the same issue of financial disclosures

25   on the table with Pre-trial Services and Miss Kamerling did.

1    I've been in contact with Kelly Neumeister about this and we

2    agreed to sort of table where we were on this until we saw what

3    Your Honor's ruling was going to be with the similar issue, so

4    I'm asking for a me-too ruling with regard to Nick Alexander as

5    to financial disclosures.

6              THE COURT:  Would there be any different concerns for

7    that defendant?

8              A WOMAN:  No, Your Honor.

9              MR. HENDERSON:  Thank you, Your Honor.

10             THE COURT:  Then your me-too request is granted.

11             MR. HENDERSON:  Thank you, Your Honor.

12             THE COURT:  If there's nothing further, thank you all

13   for coming in this morning.

14             Again we have a specific date set in the future for

15   all parties to return back to this court.  And again this

16   court's doors are open if there's something of an emergency

17   nature that needs to be addressed, since you don't have to wait

18   for that actual date; so please know that you're not cut off

19   from that opportunity.

20             If there's nothing further, thank you all for coming

21   in this morning.

22             MR. LORD:  Thank you.

23        (At 10:44 a.m. proceedings were adjourned.)

24                            --o0o--

25

1          I certify that the foregoing is a correct transcript

2    from the record of proceedings in the above-entitled matter.

3    This excludes any matters heard via telephone, in which case I

4    do not certify the speaker's identity or the content.

5
                         \s\ Laurene Kelly
6
                 This 3rd day of OCTOBER, 2008.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25